**UNITED STATES of America**

v.

**CITY OF WICHITA FALLS, et al.**

**Civ. A. No. 7–75–31–E.**

United States District Court,
N.D. Texas,
Wichita Falls Division.

Aug. 26, 1988.

---

Wayne Hughes, Asst. U.S. Atty., Fort Worth, Tex., Clifford D. Johnson, Attorney and David L. Rose and Eugenia Esch, and Jennifer Levin, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for the U.S.

James C. Harrington, American Civil Liberties Foundation of Texas Inc., Austin, Tex., Robert M. Hampton, Wichita Falls, Tex., for intervenor-plaintiff.

H.P. Hodge, Jr., City Atty., Wichita Falls, Tex., John F. Boyle, Jr., Steven R. McCown, Carla Morrison, Jenkens, Hutchison & Gilchrist, Dallas, Tex., for the City of Wichita Falls, et al.

## MEMORANDUM OPINION

MAHON, District Judge.

On October 30, 1985, the United States filed a motion for an order enforcing the Consent Decree which was entered on October 7, 1975. The Court heard testimony and argument regarding this motion on June 23 through June 25, 1987. After a thorough consideration of the testimony, the pleadings and the applicable law, the Court makes the following determinations.

### Findings of Fact

#### I. Background

This action was filed by the United States on June 4, 1975 alleging that the City of Wichita Falls had engaged in a pattern or practice of discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The complaint alleged that Wichita Falls pursued policies and practices which discriminated against women who sought employment with the Wichita Falls Police Department.

On October 7, 1975, this Court entered a Consent Decree which included an injunction that prevented the City of Wichita Falls from engaging in any act which had the purpose or effect of discriminating against any applicant or potential applicant for employment with the City of Wichita Falls Police Department because of their sex. The Consent Decree further prohibited the City of Wichita Falls from using a physical agility test as a screening device for applicants which "... operate[s] disproportionately to disqualify female applicants if it [the test] has not been shown to be an operational necessity for the position of Police Officer or to be a valid predictor of job performance as defined in the Equal Employment Opportunity Commission's *Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607."

In June of 1975, the United States Civil Service Commission issued a comprehensive report which it developed in conjunction with the cities of Fort Worth, Arlington, and Wichita Falls. The primary purpose of the report was to provide a comprehensive review of the selection procedure for entry level police officers and develop a written test which was job related or "validated."[1] The report analyzed all aspects of the selection process for police personnel, including the physical examination. A physical agility test was developed by the Fort Worth Police Department which was to simulate some of the tasks required of police personnel. The United States Civil Service Commission recommended that the

---

1. A test is validated if it is proven that the test improves the likelihood that people selected can adequately perform the job for which the test was designed.

cities use the physical agility test in their selection process. The Wichita Falls Police Department adopted the test.

The physical agility test consisted of an obstacle course (composed of a low obstacle, short wall (2'), medium wall (4'), high wall (6'), serpentine, tunnel, balance beam, balance bar and horizontal ladder), transporting a 168 pound dummy 75 feet, a stairway run and a quarter mile run.

The Wichita Falls Police Department allotted 4 minutes to complete the test. This time was set after testing 47 incumbent officers who all completed the test in less than 4 minutes. None of the officers tested were female.

Out of concern for the women applicants to the police academy, the Police Department modified the test on April 21, 1976 as follows:

1. the highest wall on the obstacle course was reduced in height from six feet to five feet;

2. the dummy used in the body drag exercise was reduced in weight from 168 lbs. to 150 lbs;

3. the total time to complete the test was increased from four minutes to six minutes.

All applicants for the police academy were required to pass the physical agility test. Prior to the test all applicants were allowed to warm up and were given specific instructions on how to perform each event.

The applicants were only timed while they were actually performing the obstacle course, the stairway run, the quarter mile run and the dummy transport. The applicants were allowed at least three minutes of rest between each of these events.

Applicants who failed the test were allowed to retake it. Prior to November 1980, there was a 60 day waiting period required before retaking the test. Effective November 11, 1980, the waiting period was reduced to 30 days. Then the time limit was reduced to two weeks sometime prior to 1984. There was no limit on the number of times an applicant could take the physical agility test.

In 1984, the Police Department, on its own initiative, conducted an internal job analysis to study the physical demands on police officers. The study indicated that the physical demands of a police officer had not changed since 1975, the year that the Civil Service did its study and recommended the use of the physical agility test as a screening device. The internal study provided the Police Department with assurance that the physical agility test was still an appropriate indicator of an applicant's ability to be an effective officer.

Also in 1984, the State of Texas raised the maximum age requirement of an applicant for police officer to 44. Out of a concern that the minimum time to complete the test may need to be increased because the age of potential applicants had increased, the Police Department had 101 incumbent officers take the physical agility test. The highest score of all the officers was slightly over five minutes. Six of the incumbent officers tested were female.

In 1984, one of the officers in the Police Department attended a training course at the Federal Bureau of Investigation's (F.B.I.) training center. At this course, the officer became aware of a physical assessment test, which is a less strenuous screening device than the physical agility test. This is the first time that a member of the Wichita Falls Police Department became aware that there was a less strenuous screening device. The Physical Assessment Test is a test of general physical condition in which an individual is tested in five categories of fitness: cardiovascular function, body composition, flexibility, dynamic and absolute strength.

In December 1984, the Police Department decided to change the screening device for applicants to the academy from the physical agility test to the physical assessment test. Applicants were required to pass the physical agility test after they had undergone some training in the police academy. This change was made for two reasons. First, the physical agility test "is a test of specific strengths and motor abilities directly related to the accomplishment of police functions. Motor skills can be taught to a person who is in good general health and physical condition. The motor skills necessary for a police trainee need

not be at the same level as that of the police officer. Consequently, it is possible that the additional strength and increased motor ability necessary for the performance of police duties and successful execution of the Physical Agility Test could be acquired during the 16–week training period.... Secondly, general physical conditioning ... [is a] better overall indicator of an individual's ability to function effectively in normal life situations such as that of the police recruit." (Government Ex. 26).

The physical assessment test is a professionally accepted means of measuring general physical conditioning. The passing score for various portions of the physical assessment test fluctuate with a person's age and sex. In order to pass the test for the Police Department, an applicant needed to score "fair" for a person of his or her own sex who is 40 to 49 years of age. A person is classified in "fair" physical condition if that person scores equal to or better than 50% of the people tested of his or her own sex. The age bracket 40–49 was used because the oldest age for an applicant to the police academy is 44. Thus, all applicants, regardless of their age, were tested against the standards for an individual age 40–49.

Between 1976 and 1985, 863 applicants took the physical agility test or the physical assessment test as a screening device to enter the police academy. Their results on the test according to their sex are illustrated by the following chart.

| Period | Total Tested | | Passed | | Passing Rate | | Female Passing Rate as % of Male Passing Rate |
|---|---|---|---|---|---|---|---|
| | M | F | M | F | M | F | |
| 1976–84 | 718 | 145 | 697 | 78 | 97.1% | 53.8% | 55.41% |
| 1985 [2] | 99 | 31 | 75 | 15 | 75.8% | 48.4& | 63.85% |
| 1976–85 | 817 | 176 | 772 | 93 | 94.5% | 52.8% | 55.87% |

The EEOC Uniform Guidelines suggest that a test has an adverse impact on a minority group if the minority passing rate is less than 80% of the majority passing rate. As is indicated by the above chart, the female passing rate on both the physical agility test and the physical assessment test is less than 80% of the male passing rate. However, simply because a test has an adverse impact under the EEOC Uniform Guidelines on a minority group does not mean that the test necessarily is discriminatory.

## DISCUSSION

Paragraph 1 of the Consent Decree which the parties entered into on October 7, 1975 enjoins the City of Wichita Falls from "engaging in any act which has the purpose or effect of discriminating against any employee, applicant or any potential applicant for employment with the City of Wichita Falls Police Department because of the individual's sex." The Consent Decree also has a specific paragraph which specifically applies to the physical agility test. Paragraph 3(d) prohibited the City of Wichita Falls from using a physical agility test as a screening device for applicant which "... operate[s] disproportionately to disqualify female applicants if it [the test] has not been shown to be an operational necessity for the position of Police Officer or to be a valid predictor of job performance as defined in the Equal Employment Opportunity Commission's *Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607."

### I. Physical Agility Test

 The statistics listed above indicate that the physical agility test disproportionately disqualified female applicants for the police force. As the Consent Decree indicates, such disproportion is permissible if the test is "an operational necessity" or a "valid predictor" of job performance as defined by the EEOC Guidelines.[3] The 1970

2. Physical assessment test administered in 1985.

3. The parties have disputed whether the clause "as defined in the Equal Employment Opportunity Commission's *Guidelines* ..." modifies the phrase "operational necessity" and the phrase "valid predictor" or whether it just modifies the phrase "valid predictor." The Court finds that the parties intended the clause to only modify the phrase "valid predictor." The 1970 Guide-

EEOC Guidelines were in effect when the parties entered into the Consent Decree in 1975. These guidelines were revised after 1975.

Therefore, the City of Wichita Falls needs to show that the physical agility test is an "operational necessity." The City has satisfied this burden as to every aspect of the physical agility test. Five female police officers testified about the physical agility test. Each of them stated that a police officer must be able to perform all of the tasks in the physical agility test to be an effective police officer. In addition, the female officers cited examples of situations which they encountered as police officers that required them to perform tasks which are included in the physical agility test.

Some of the situations which these female officers faced and their similarity to the physical agility test are as follows. The low hurdle included in the obstacle course is illustrative of many chase situations where police officers must jump over small fences or hedges. The short wall (4 feet) included in the obstacle course is illustrative of the average residential fence in the Wichita Falls area. Police officers often need to clear these fences quickly while in pursuit of a suspect. The high wall (5 feet) is illustrative of loading docks or fences which surround businesses in the Wichita Falls area. Officers must be able to scale these obstacles rapidly. Failure to scale these obstacles may endanger the lives of citizens or other officers.

The serpentine portion of the obstacle course is illustrative of a chase situation in which an officer must avoid cars or pedestrians while chasing a suspect. The tunnel portion of the obstacle course is illustrative of situations where an officer must pursue suspects through a confined space such as a storm drain. It also simulates rescue operations.

The balance beam illustrates situations where a police officer is pursuing a suspect through a construction site or across a drainage ditch or a ravine.

The horizontal ladder simulates climbing trees and towers. It also demonstrates upper body strength which is very important to an officer when confronting a suspect or when assisting an individual in a rescue situation.

The 75 foot drag of an artificial dummy weighing 150 pounds simulates dragging an uncooperative or unconscious individual from a place of danger, such as a burning house.

The stairway run and the quarter-mile run simulate situations were officers must pursue a suspect up or down a flight of stairs or over a quarter mile distance.

Based upon this evidence, the Court finds that the tasks performed during the physical agility test are the same as tasks which a police officer must be able to perform. Furthermore, the time limit set for completing the examination accurately reflects the time which it takes for officers on the Wichita Falls Police Force to complete the examination. Therefore, the Court finds that the various aspects of the test are operational necessities for a Wichita Falls police officer. This is the physical agility test which was recommended by the United States Civil Service Commission in 1975, with minor changes that made the test easier to pass.

Since the Court finds that the physical agility test is an operational necessity, it need not determine whether the test is a valid predictor under the EEOC Guidelines. However, out of an abundance of caution, the Court will analyze whether the test meets the EEOC standards. The 1970 EEOC Guidelines were in effect at the time the parties entered into the Consent Decree. The physical agility test satisfies the minimum standards necessary to validate a test under these guidelines. First, the subjects tested were representative of the typical candidates for the job. 29 C.F.R. § 1607.5(b)(1). This standard can be satisfied by testing current police officers. *United States v. Georgia Power Co.,* 474

---

lines do not make any reference to "operational necessity." The Guidelines do not use the words "valid predictor" but it does discuss the

requirements needed to assure that a test validly predicts the job performance of an applicant.

F.2d 906, 912 (5th Cir.1973). The Police Department tested incumbent police officers on two occasions and recorded their test scores. Second, the tests must be administered under controlled conditions. 29 C.F.R. § 1607(b)(2). There is no dispute that the physical agility test was administered under a controlled environment. Third, the work criteria intended to be predicted through the test must be identified. 29 C.F.R. § 1607.5(b)(3). Defendant's Exhibit 11 identifies several of the essential physical capacities which a police officer must be able to perform and how they relate or are linked to the activities involved in the physical agility test. Fourth, the examiner must carefully evaluate the test to see that it does not unfairly burden minorities. 29 C.F.R. § 1607.5(b)(4). The Police Department modified the test on two occasions to make it easier for women. Neither the Government or the Police Department can identify any factors which unfairly depress the scores of women. Finally, data must be generated as to the results of the majority and minority groups. 29 C.F.R. § 1607.5(b)(5). The City did keep data on the pass rates of men and women. Accordingly, the Court finds that the physical agility test satisfies the requirements in the 1970 EEOC Guidelines.

The testimony of the police officers for the City of Wichita Falls and the City's experts illustrates that a police officer *must* be proficient at all aspects of the physical agility test in order to be an effective police officer. In other words, there is a direct correlation or link between the tasks which make up the physical agility test and the tasks which a person must be able to perform to be an effective police officer. A police officer's inability to perform any of the tasks could result in the death of that officer, another officer, or a civilian. Courts have recognized that a formal study need not be done to establish that a test accurately reflects the demands of a job. Evidence can be presented at a trial, as in this case, which demonstrates that the test accurately reflects the qualities needed to perform a certain job. Thus, the physical agility test is "content valid," meaning the tasks performed in the test accurately simulate tasks performed by police officers.

## II. Physical Assessment Test

■ The Wichita Falls Police Department first became aware of the physical assessment test in 1984. At that time, the Police Department decided to administer the physical agility test during the police academy instead of prior to it because some of the motor skills necessary to pass the physical agility test could be acquired during the police academy training.

As a screening mechanism for entry into the police academy, the Police Department adopted the physical assessment test. This test analyzes the general fitness of an individual instead of an individual's ability to perform certain tasks. The test was developed by the Institute for Aerobic Research in Dallas, Texas, and is a professionally accepted measure of general physical conditioning. The test is based upon a sampling in excess of 35,000 individuals who attended the clinic at the Institute.

The Government alleges that the physical assessment test discriminates against women. The Court disagrees, finding that such is impossible because of the nature of the test. Although women and men take the same test, the standards against which they are compared are not the same. Women are compared against women and men are compared against men.

Furthermore, the physical assessment test is validated through the method of "construct validity," meaning that the test accurately identifies characteristics necessary to perform a job. It is incontrovertible that police officers must be in good physical condition to perform their job. (Defendant's Ex. 5). The physical assessment test is a nationally accepted and popular test for determining the general fitness of an individual.[4]

---

4. The Government suggests that the physical assessment test is not a valid test because the people used in constructing the test are not representative of the population in Wichita Falls, Texas. The people tested are from all parts of this country. Approximately 40% are

The only question is whether the standard used by the Police Department is appropriate. As stated above, an applicant only needs to be of "fair" physical condition for a person of the same sex between the ages of 40 and 49 to enter the academy. The Court finds that, based upon the evidence presented during the trial, this is the absolute minimum physical condition for an effective police officer. Officers are daily confronted with situations where they must exert physical force, move rapidly, and stress their cardiovascular system. They must be in at least "fair" condition for a person between the ages of 40 and 49 to withstand these physical challenges. Therefore, it is a valid test to determine the fitness of an applicant for the police academy.

III. Conclusion

The Court is aware that no formal validation study has been written for the physical agility test or the physical assessment test. Such is not necessary when, as in this case, the evidence is abundant that successful completion of these tests is necessary to be an effective police officer in Wichita Falls, Texas. *United States v. Georgia Power Co.,* 474 F.2d 906, 915 (5th Cir.1973).

Accordingly, the Court finds that the City of Wichita Falls has not violated the consent decree. All relief requested in the Government's motion to enforce the consent decree is hereby denied. This case is closed.

from the Dallas area. The people tested generally are middle to upper class in terms of income and are at the higher level of the educational continuum. The Court recognizes this shortcoming in the test. However, there is no test which has taken a true national sampling to test general physical health. Nor is there a test for the general physical condition of individuals in Wichita Falls.

Even though this test has these minor shortcomings, it is widely accepted as an accurate indicator of overall physical health. In addition, when evaluating the appropriateness of a test for determining job performance, the Guidelines recognize that the correlation between the test and the job does not have to be as tight when there is a risk of human life involved. 29 C.F.R. § 1607.5(c)(2)(iii) (1975). Few jobs involve a greater risk to human life than that of police officer.