ALSPAUGH v COMMISSION ON LAW ENFORCEMENT STANDARDS

Docket No. 220156. Submitted February 5, 2001, at Detroit. Decided June 29, 2001, at 9:05 A.M.

Aaron W. Alspaugh and Raymond Kujawa brought an action in the Oakland Circuit Court against the Commission on Law Enforcement Standards, formerly known as the Michigan Law Enforcement Officers Training Council, alleging gender discrimination resulting from the defendant's use of different physical fitness performance standards for men and women regarding a performance skills test that must be completed to attend a police academy and eventually become a viable candidate for certification as a police officer. The plaintiffs also alleged that if gender-norming the physical fitness performance standards is constitutionally sanctioned, then the defendant should also age-norm the performance standards to control for concomitant decreases in muscular strength, endurance, and aerobic capacity attributable to the aging process and that the failure to do so is unlawful age-based discrimination. The court, Rudy J. Nichols, J., granted summary disposition in favor of the defendant. The plaintiffs appealed.

The Court of Appeals *held*:

1. Ignoring the immutable physiological differences between males and females with regard to the performance skills test would disproportionately exclude female candidates from the pool of individuals eligible for certification as police officers.

2. Tests that control for inherent immutable characteristics between males and females and thus provide differing standards do not violate equal protection guarantees.

3. The performance skills test at issue is designed to assess general physical fitness, not to delineate the specific minimum fitness standards required to become a police officer. Gender norming ensures that the most physically fit female candidates are placed into the larger pool of qualified applicants from which different agencies may hire. Gender norming is a measure designed to include viable female candidates, not to exclude viable male candidates. The gender norming is an act of inclusion rather than exclusion.

4. The gender-norming practice serves the sufficiently important governmental interest of avoiding the potential for a disproportionate effect that a single standard would necessarily have on the female candidates in the area of employment, an important governmental interest, and is sufficiently related to the achievement of that interest. The practice does not violate the equal protection provisions of Const 1963, art 1, § 2 or the Civil Rights Act, MCL 37.2101 *et seq.*

5. The plaintiffs failed to establish the essential elements to sustain a viable claim of age discrimination; i.e., they failed to show that they had qualifications comparable to the person ultimately selected and that the determining factor in the decision not to hire them was their age.

Affirmed.

CONSTITUTIONAL LAW — EQUAL PROTECTION — GENDER-BASED DISCRIMINATION — GENDER-NORMING TEST PROCEDURES.

The equal protection provisions of the constitution and the Civil Rights Act are not violated where a performance skills test developed by the Commission on Law Enforcement Standards to assess the general physical fitness of candidates for police academies uses different performance standards for males and females to control for the relative differences in strength because of the immutable physiological differences between the genders; the use of the gender-norming procedure serves the important governmental interest of avoiding the potential for the disproportionate effect on the employment opportunities of female candidates that a single standard would have and is sufficiently related to the achievement of that interest (Const 1963, art 1, § 2; MCL 37.2101 *et seq.*).

*Gabrian & Parks, P.C.* (by *Dennis L. Gabrian*), for the plaintiffs.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Kristin M. Smith*, Assistant Attorney General, for the defendant.

Before: HOOD, P.J., and DOCTOROFF and K. F. KELLY, JJ.

K. F. KELLY, J. Plaintiffs Walter Alspaugh and Raymond Kujawa appeal as of right from the trial court's decision granting defendant's motion for summary

disposition and dismissing their claims of gender and age discrimination. We affirm.

I. OVERVIEW

This appeal addresses the constitutional propriety of "gender-norming" physical fitness performance standards in conjunction with a preemployment physical fitness test adopted and implemented by the Michigan State Police. To attend the police academy and eventually become a viable candidate for certification as a police officer, the candidate must first successfully complete a performance skills test. The results of the test are gender-normed, ostensibly to control for the innate physiological differences between the genders, with the top scoring male and female candidates becoming eligible to attend the police academy. Plaintiffs contend that the gender-norming process, which specifies different performance standards for men and women, unfairly discriminates against them on the basis of their gender in contravention of the equal protection provisions of the Michigan Constitution and the state Civil Rights Act (hereinafter CRA).[1] Plaintiffs also allege that if gender-norming physical fitness performance standards is constitutionally sanctioned, then defendant should also "age norm" the performance standards. Plaintiffs contend that age norming is necessary to control for concomitant decreases in muscular strength, endurance, and aerobic capacity attributable to the aging process. Consequently, plaintiffs submit that defendant's failure to age norm the performance standards results in unlawful age-based discrimination in viola-

---

[1] MCL 37.2101 *et seq.*

tion of the equal protection provisions of the Michigan Constitution and the CRA.

Defendant maintains that the primary objective of the physical fitness skills test is to measure general *physical fitness* rather than establish the minimum *physical requirements* necessary for law enforcement officers. In other words, the test was designed to ascertain general fitness levels and, thus, separate the physically fit from the physically unfit, not to create minimum performance standards required to become a police officer. If a candidate does not pass the physical performance skills test, that candidate may retake the test as frequently as the candidate pleases until that individual receives a passing score.

## II. DEFENDANT'S PERFORMANCE SKILLS TEST

Defendant, the Commission on Law Enforcement Standards (hereinafter COLES),[2] is the state agency authorized by statute to promulgate rules establishing the minimum level of physical fitness required for "recruitment, selection, appointment, and certification of law enforcement officers." MCL 28.609(1)(a). Pursuant to that authority, the COLES developed the performance skills test under the supervision and direction of a psychometrician, an industrial psychologist, and an exercise physiologist. The test itself includes six different activities designed to measure overall physical fitness vis-à-vis dynamic strength, explosive

---

[2] The COLES is currently the agency charged with defining minimum physical fitness standards for law enforcement officers and was formerly known as the Michigan Law Enforcement Officers Training Council (MLEOTC.)

strength, speed, agility, and aerobic capacity.[3] Both males and females perform the same six events. However, to account for the relative differences in strength between men and women due to the immutable physiological differences between the genders and to thus eliminate the potential for an adverse impact on female candidates,[4] the council[5] created different performance standards applicable to males and females.[6] The method employed to accomplish this task, was to "norm" the candidates' performance

[3] The six "events" that comprise the test are (1) the "combined hand-grip," which measures grip strength, (2) the "obstacle run," which measures the candidate's ability to run, drop down, crawl through an obstacle, climb a barrier with handholds and footholds, and scale a wall, (3) the "165 lb. dummy drag," which measures muscular endurance, upper- and lower-body strength, and aerobic capacity by the amount of time required to drag a life-form dummy thirty feet, (4) the "95 lb. carry-lift," which measures muscular endurance, upper- and lower-body strength, and aerobic capacity by the amount of time required to carry a weighted duffel bag thirty feet and lift and place the bag on a platform thirty-one-inches high, (5) the "60 seconds pushups," which measures upper-body strength by how many pushups the candidate can perform during that interval of time, and (6) the "half-mile shuttle run," which measures aerobic capacity and explosive strength by the amount of time required to run that distance.

[4] In a document entitled "Validation of Entry-Level Police Officer Employment Tests," prepared for the MLEOTC by a corporation contracted to develop testing procedures, it was noted that the "basic physical skills test battery . . . consistently produced major male-female differences in the test scores of applicants" and that the "adverse impact of this examination against women has been pronounced."

[5] At the time that the Validation of Entry-Level Police Officer Employment Tests document was created, the MLEOTC was the council charged with establishing minimum standards of physical fitness.

[6] The different performance standards required for each candidate based on gender are as follows:

| Event | Male | Female |
|---|---|---|
| Pushups (Repetitions) | 38-43 | 14-18 |
| Grip-total (Klg.) | 115-122 | 74-79 |
| Obstacle Course (Seconds) | 12.0-12.1 | 20.2-17.7 |
| 165 lb. Dummy Drag (Seconds) | 7.9-7.4 | 14.3-12.4 |
| 95 lb. Dummy Carry (Seconds) | 5.7-5.4 | 11.6-9.4 |
| ½ Mile Run (Min & Sec) | 4:07.2-3:55.6 | 5.11.2-4:50.1 |

by gender so that females are compared with females and males are compared with males. In this way, it was possible to identify and select the most generally physically fit candidates from each group. These candidates were then placed into the larger pool of those individuals eligible to attend the police academy and eventually attain certification as police officers.[7]

### III. THE PLAINTIFFS

Plaintiffs Aaron Alspaugh and Raymond Kujawa are both currently employed as deputy sheriffs in the corrections division in Oakland County. Both Alspaugh and Kujawa took defendant's performance skills test, did not receive passing scores, and, accordingly, neither of the plaintiffs became eligible to attend the police academy and eventually receive certification as police officers. However, both would have received passing scores if their respective performances had been evaluated pursuant to the standards applicable to the female candidates. Thus, plaintiffs argue that defendant's "gender-norming" procedure amounts to intentional gender-based discrimination in violation of the equal protection provisions contained in art 1, § 2 of the Michigan Constitution[8] and the CRA. Plaintiffs

---

[7] To establish a bell curve distribution of the candidates' raw scores, the raw test scores are converted into "stanine scores" applicable to each of the six different events that are then distributed into nine stanines to achieve the bell curve. This process allows for the bifurcation of the female group, thus identifying the most physically fit individuals. Thereafter, a cutoff score is established by considering how the candidates from the previous year performed. Once the cutoff point for the female candidates is established and the percentage of women that passed is ascertained, then that percentage of females receiving passing scores is then applied to the men's group, a cutoff point is established so that comparable percentages of males and females attain passing scores.

[8] Const 1963, art 1, § 2.

also claim that if gender norming passes constitutional muster, then the performance standards should also be "age normed" to account for the relative decrease in muscular strength and general fitness as a result of the aging process.

Plaintiffs sought injunctive and declaratory relief for the alleged violations.[9] Plaintiffs appeal the trial court's decision granting defendant's motion for summary disposition pursuant to MCR 2.116(C)(10) and further dismissing plaintiffs' complaint in its entirety. We affirm.

### IV. STANDARD OF REVIEW

This court reviews de novo a trial court's decision granting or denying a motion for summary disposition. *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347; 597 NW2d 250 (1999). Incumbent on the court when considering a motion brought pursuant to MCR 2.116(C)(10) is to consider, in a light most favorable to the nonmoving party, all the documentary evidence, along with all reasonable inferences drawn therefrom, to determine whether a genuine issue of material fact exists upon which reasonable minds may differ. *Wilcoxon, supra* at 358.

### V. PLAINTIFFS' CLAIMS OF INTENTIONAL GENDER-BASED DISCRIMINATION

Plaintiffs argue that the performance skills test is not designed to assess general physical fitness, but, rather, is designed to measure the minimum physical

---

[9] Initially, plaintiffs sought monetary damages. However, plaintiffs subsequently stipulated to dismiss their claim for monetary damages, thus leaving only plaintiffs' prayer for injunctive and declaratory relief.

skills necessary to be a police officer, and that gender-norming the scores gives preferential treatment to female candidates thus constituting unlawful affirmative action. Plaintiffs argue that gender norming to avoid statistical disparities by gender in passing rates is not substantially related to an important governmental interest and violates the Equal Protection Clause of the Michigan Constitution and the CRA.

On the contrary, defendant argues that the justification for gender-norming the performance standards is to eliminate the disproportionate impact or the possibility of disparate-impact discrimination on women because of their physiological characteristics. Defendant maintains that ignoring the immutable physiological differences between males and females as regards the performance skills test would disproportionately exclude female candidates from that pool of individuals eligible for certification as police officers. We agree.

### A. APPLICABLE CONSTITUTIONAL AND STATUTORY PROVISIONS

Article 1, § 2 of the Michigan Constitution provides in pertinent part:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.

The CRA expanded the constitutional classifications of "religion, race, color or national origin" to include age, sex, and marital status. MCL 37.2102(1) provides, in pertinent part, that "[t]he opportunity to obtain employment . . . without discrimination because of

. . . sex . . . is recognized and declared to be a civil right." See also *Neal v Dep't of Corrections (On Rehearing)*, 232 Mich App 730, 739; 592 NW2d 370 (1998); *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation*, 425 Mich 173, 186; 387 NW2d 821 (1986) (recognizing that the CRA broadened the constitutional classifications to include age, sex, and marital status).

In *Neal, supra* at 734, the Court acknowledged that "[t]he purpose of the Civil Rights Act is to prevent discrimination directed against a person because of that person's membership in a certain class and to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." The Michigan Constitution guarantees equal protection of the laws, which means that those who are similarly situated must receive the same treatment. *In re Hawley*, 238 Mich App 509, 511; 606 NW2d 50 (1999). Conversely, equal protection does not require the same treatment be given those that are not similarly situated. *Id.*

Classifications based on gender are reviewed under the "intermediate" or "heightened-scrutiny" test and will pass constitutional muster only if the classification is " 'substantially related to an important governmental objective.' " *Crego v Coleman*, 463 Mich 248, 260; 615 NW2d 218 (2000) (citation omitted); *Gora v Ferndale (On Remand)*, 217 Mich App 295; 551 NW2d 454 (1996). However, as the Court in *Neal* observed:

> [M]erely because the state engages in a practice that treats men and women differently, it does not necessarily mean that it engages in unlawful gender discrimination. Rather, the test is whether the gender-based treatment serves a sufficiently important governmental interest and is

> substantially related to the achievement of that interest. [*Neal, supra* at 741.]

In *Dep't of Civil Rights, supra* at 202, our Supreme Court stated that "[f]acts and circumstances . . . play a large part in assessing the end-means relationship. While the relationship need not be perfect, it should be close." If the classification at issue does not pass this intermediate level or heightened scrutiny, the classification is constitutionally infirm and, thus, must fall.

With regard to gender discrimination, those federal civil rights cases interpreting title VII of the federal Civil Rights Act of 1964, 42 USC 2000e *et seq.*, and as amended, 42 USC 1983, although not controlling, provide persuasive authority for considering and resolving cases brought pursuant to Michigan's Civil Rights Act. *Bedker v Domino's Pizza, Inc*, 195 Mich App 725; 491 NW2d 275 (1992). Accordingly, we turn to those cases for general guidance. In *Lynch v Freeman*, 817 F2d 380, 389 (CA 6, 1987), the court stated that "[a]natomical differences between men and women are 'immutable characteristics,' just as race, color and national origin are immutable characteristics." Thus, the issue becomes whether tests that control for inherent "immutable" characteristics between males and females and thus provide differing standards violate equal protection. We hold that they do not.

In *United States v City of Wichita Falls*, 704 F Supp 709 (ND Tex, 1988), a case cited and relied on by plaintiffs, the court considered two separate and distinct tests: the physical agility test and the physical assessment test. Whereas the physical agility test was "a test of specific strengths and motor abilities directly related to the accomplishment of police func-

tions," *id.* at 711, the physical assessment test was employed as a screening mechanism to analyze "the general fitness of an individual *instead of an individual's ability to perform certain tasks.*" *Id.* at 714 (emphasis added). The United States alleged that the physical assessment test discriminated against women in violation of the provisions of a consent decree that enjoined the city from "engaging in any act which had the purpose or effect of discriminating against any applicant . . . for employment with the City of Wichita Falls Police Department because of their sex." *Id.* at 710. The court disagreed, stating that discrimination based on gender would be "impossible" relative to the physical assessment test because "[a]lthough women and men take the same test, *the standards against which they are compared are not the same. Women are compared against women and men are compared against men.*" *Id.* at 714 (emphasis added). The court went on to note that the physical assessment test at issue was validated through " 'construct validity,' meaning that the test accurately identifies characteristics necessary to perform a job." *Id.* To that end, the court noted that it is "incontrovertible that police officers must be in good physical condition to perform their job." *Id.*

### B. ANALYSIS

In the case at bar, defendant's practice of gender-norming physical fitness performance standards creates a gender-based classification. However, as the *Neal* Court observed, that alone is not sufficient to establish illicit gender-based discrimination. Gender-based classifications are subject to heightened scrutiny and will overcome the constitutional challenge if

substantially related to an important governmental interest.

Like the physical assessment test employed in *Wichita Falls*, the documentary evidence submitted in the case sub judice definitively establishes that the performance skills test at issue herein is a test designed to assess general physical fitness, not to delineate the specific minimum fitness standards required to become a police officer.[10] Gender norming ensures that the most physically fit female candidates are placed into the larger pool of qualified applicants from which different agencies may hire.[11] Reviewing

---

[10] Plaintiffs cite *Lanning v Southeastern Pennsylvania Transportation Authority*, 176 FRD 132 (ED Pa, 1997), to support their position. *Lanning* has a lengthy history indeed. On remand from the United States Court of Appeals, 181 F3d 478 (CA 3, 1999), the court had to determine whether the Southeastern Pennsylvania Transportation Authority (SEPTA) satisfied its burden of establishing that the specified aerobic capacity required was the minimum capacity necessary to successfully perform the job of a SEPTA transit police officer. On remand, *Lanning v Southeastern Pennsylvania Transportation Authority*, 2000 WL 1790125 (ED Pa, 2000), the court held that the SEPTA did indeed clearly demonstrate that the specific aerobic capacity required is, in fact, the minimum aerobic capacity required for successful performance as a SEPTA officer. Plaintiffs' reliance on *Lanning* is therefore misplaced. The aerobic-capacity requirements at issue in *Lanning* were requirements that the SEPTA determined would be necessary for the candidate, whether male or female, to perform successfully as a SEPTA transit officer. That is not the issue raised herein. Unlike the aerobic-capacity requirement considered in *Lanning*, a review of the entire record reveals that the performance skills test in this case was not designed to identify specific fitness standards required to become a police officer. On the contrary, the performance skills test was designed to assess general physical fitness. Because the performance skills test in the case at bar differs significantly from the test at issue in *Lanning*, the court's decision in *Lanning* is factually distinguishable and, thus, inapplicable to the issues presented for resolution herein.

[11] Dale Rothenberger is currently employed with the Department of State Police and is the section chief for the Michigan Justice Training Commission, which is one of the sections of the Commission on Law Enforcement Standards. Mr. Rothenberger worked for the Michigan Law Enforcement Officers Training Council (MLEOTC), which became the Commission on Law Enforcement Standards (COLES) in 1993. When Mr. Rothenberger worked for the MLEOTC, one of his responsibilities in the late

plaintiffs' claim of gender-based discrimination occa-
sioned by norming performance standards according
to gender, those courts that make a distinction
between inclusive procedures designed to increase
the number of qualified applicants and those proce-
dures designed to exclude members of certain groups
are particularly insightful. As one court astutely
observed, "non-discrimination is the foundation of
inclusion, while discrimination is a basis of exclu-
sion." *Shuford v Alabama State Bd of Ed*, 897
F Supp 1535, 1552 (MD Ala, 1995). Indeed, ensuring
the largest pool of qualified candidates is a desirable
goal. In fact, "[a]n inclusive recruitment effort enables
employers to generate the largest pool of qualified
applicants and helps to ensure that minorities and
women are not discriminatorily excluded from
employment. This not only allows employers to
obtain the best possible employees, but it 'is an excel-
lent way to avoid lawsuits.' " *Duffy v Wolle*, 123 F3d
1026, 1039 (CA 8, 1997) (citations omitted).[12] The only
harm wrought by ensuring the largest possible pool
of qualified candidates is increasing competition
between and among the most capable applicants for

seventies and early eighties was to develop and administer the perform-
ance skills test at issue herein. Mr. Rothenberger testified that the per-
formance skills test was developed in 1982 and 1983 with the first pilot
test occurring in 1984. Mr. Rothenberger further testified that he has been
responsible for administering the performance skills test since its incep-
tion. Mr. Rothenberger stated that "[w]e bifurcated the performance of the
women into a group of more fit people and a group of less fit to nonfit,
unfit and that's where we make the cut, and we go over and do the same
thing with the men."

[12] See also *Shuford, supra* at 1552 (stating "because non-discrimination
on the basis of sex is required by law, the failure to take sex into account
to insure non-discrimination can be illegal. This should not be surprising
because non-discrimination is the foundation of inclusion, while discrimi-
nation is a basis of exclusion").

the position.[13] The *Shuford* court recognized that techniques of inclusion do not give rise to the traditional equal protection or title VII analysis employed by those courts analyzing techniques designed to exclude.

Although not confronted with an affirmative action program designed to remedy past discrimination against women within the Michigan State Police Department, the inclusive/exclusive dialogue is nonetheless instructive in considering the issues raised in the case at bar. Defendant's gender norming the performance skills test to determine the most physically fit female candidates relative to their gender is not designed to *exclude* viable male candidates, but rather, is a measure designed to *include* viable female candidates.[14] As the court in *Shuford* explained, "[e]xpanding the pool is an inclusive act. . . . Exclusion occurs if . . . the best candidate from the expanded pool fails to get the job because he was passed over for a woman. This can only happen at the selection stage, which occurs *after* the pool expansion." *Shuford, supra* at 1553 (emphasis added).

Defendant's practice of gender-norming the performance skills test is employed to segregate the most physically fit candidates within each respective

---

[13] See *United States v Paradise*, 480 US 149, 183; 107 S Ct 1053; 94 L Ed 2d 203 (1987) (identifying that the distinction between inclusion and exclusion means that "[q]ualified white candidates simply have to compete with qualified black candidates").

[14] See, generally, *Duffy, supra*, and *Shuford, supra* (discussing the differences between inclusive gender-conscious techniques and techniques designed to exclude. The former is employed to generate the largest pool of qualified candidates possible and thus increase competition. These are desirable goals and do not provide the basis for a cognizable gender discrimination claim as opposed to the latter, which represents the very core of discrimination itself).

group by controlling for the innate physiological differences between the genders and operates to expand the entire pool of qualified applicants. Thus, defendant's practice of gender-norming the performance skills test is an act of inclusion rather than exclusion.[15] The performance skills test was a test neither designed nor implemented to identify the minimum requirements to become a police officer. Rather, the test was designed and appropriately "normed" to assess general physical fitness, taking into account immutable physiological differences between male and female candidates to ensure that the most physically fit from each group would be eligible for eventual certification as police officers.

Accordingly, the only "harm" to the male candidates occasioned by gender norming in the instant case is that, to obtain certification as police officers, eventually, the male candidates must compete "against a larger pool of qualified applicants," which neither is an " 'appropriate objection' " nor states a "cognizable harm." *Duffy, supra* at 1039 (citation omitted). See also *Barbera v Metro-Dade Co Fire Dep't,* 117 F Supp 2d 1331 (2000) (holding that modifications to the physical ability test to increase the number of qualified female applicants pursuant to the fire department's affirmative action plan did not constitute unlawful gender-based discrimination).

Bearing these principles in mind, and upon review of the complete record, we hold that defendant's gender-norming procedure is designed to control for the

---

[15] In fact, Dale Rothenberger established that the performance skills test is a mechanism to identify the most physically fit females and the most physically fit males to comprise "a qualified pool of candidates from which agencies could hire that include both men and women."

immutable physiological differences between males and females and to, thus, determine and attain the same levels of general physical fitness within each of the relative gender classes so that the most physically fit individuals within each group are identified and become eligible for eventual certification as police officers. The governmental interest in gender-norming the performance standards is to avoid the potential for a disproportionate impact that a single standard would necessarily have on the female candidates.[16] Avoiding a disproportionate impact on females in the area of employment is indeed an important governmental interest. Further, gender-norming the performance standards to account for the immutable physiological differences in strength and aerobic capacity between males and females is significantly related to that important governmental interest.

Accordingly, we hold that defendant's process of gender-norming the physical performance standards does not unlawfully discriminate against male candidates in violation of the equal protection provisions of the Michigan Constitution or the CRA. On review de novo of the record, we find that there is no genuine issue of material fact precluding defendant from being granted summary judgment as a matter of law. Thus, we affirm the decision of the trial court in this regard.

## VI. PLAINTIFFS' ALLEGATIONS OF AGE-BASED DISCRIMINATION

Plaintiffs also contend that the performance skills test employed by defendant results in "unequal treat-

---

[16] See n 3, *supra*.

ment of plaintiffs because of their . . . age" in violation of the CRA.

Plaintiffs' claims of age discrimination are based on section 202 of the Civil Rights Act,[17] which provides in pertinent part:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . . .

The fundamental requirement inherent in any claim alleging discrimination premised on age, is to "establish . . . that age discrimination was a determining factor in the failure or refusal to hire." *Dubey v Stroh Brewery Co*, 185 Mich App 561, 564; 462 NW2d 758 (1990). In other words, the plaintiff must establish by competent evidence that the plaintiff had "*qualifications comparable to the person ultimately selected, but . . . that [the plaintiff's] age was a determining factor in the defendant's refusal to hire plaintiff.*" *Id.* at 564-565 (emphasis added).

Plaintiffs can set forth a cognizable claim of age discrimination on the basis of a theory of intentional discrimination or by establishing that the practice at issue has a disparate impact on individuals because of their age. *Barnell v Taubman Co, Inc*, 203 Mich App 110; 512 NW2d 13 (1993).

A review of the pleadings indicates that plaintiffs' main theory is that the performance skills test has a disparate impact on the "older male candidates." To that end, plaintiffs argue that there were significant statistical differences in passing rates between male

---

[17] MCL 37.2202.

candidates in the seventeen to twenty-six age category and those candidates in the thirty-seven to forty-six age category. Given the statistical disparity, plaintiffs argue that the burden necessarily shifts to defendant to establish that the testing criteria were valid and job related. Further, plaintiffs submit that if gender-norming the performance standards to control for the immutable characteristics between males and females to avoid gender-based discrimination is desirable and constitutionally sanctionable, then "age-norming" the performance standards to account for physical deterioration unavoidably attributable to the aging process, is likewise desirable and constitutionally sanctionable. Consequently, age-norming the performance standards should also be employed to avoid discrimination based on age. We disagree.

In the case at bar, plaintiffs do not allege intentional discrimination, but, rather, allege that defendant's performance skills test has a disparate impact on "older" male candidates. Accordingly, to prevail under a disparate impact theory, plaintiffs must establish that they are members of a protected class and that a facially neutral practice disproportionately impacts or burdens them more harshly than others. *Roberson v Occupational Health Centers of America, Inc,* 220 Mich App 322, 330; 559 NW2d 86 (1996); see, also, *Squire v General Motors Corp,* 174 Mich App 780, 784; 436 NW2d 739 (1989). Plaintiffs must not only establish membership in a protected class, but must further establish that they were treated differently "than persons of a different class for the same or similar conduct." *Wolff v Automobile Club of Michigan,* 194 Mich App 6, 11; 486 NW2d 75 (1992). The class distinctions for the purpose of analyzing plaintiffs' age discrimination claim appear to be male can-

didates seventeen to twenty-six years of age and male candidates thirty-seven to forty-six years of age.[18] Plaintiffs claim that the passing rate for the male candidates in the thirty-seven to forty-six age category was sixty-two percent less than the passing rate for the male candidates in the seventeen to twenty-six age category, thus establishing a disparate impact on the "older candidates."[19]

First, plaintiffs presume, rather than adequately establish, their alleged protected class status. Plaintiffs do not show how male candidates in the thirty-seven to forty-six age category who submit to defendant's performance skills test are a protected group relative to those in the eighteen to twenty-six age category that also submit to the test. Plaintiffs offer statistics ostensibly establishing a disparity in the passing rates between these two groups of male candidates and from that conclude that the disparity was caused by the candidates' age. However, plaintiffs otherwise fail to establish that the precipitating factor causing the statistical disparity was the candidates'

---

[18] To further their disparate impact claim, plaintiffs submit that in 1995, the passing rate for male candidates in the seventeen to twenty-six age group was 63.3 percent while the passing rate for male candidates in the thirty-seven to forty-six age group was only 29.1 percent. Plaintiffs further submit that between January 1, 1993, and June 5, 1998, 61.5 percent of the male candidates in the seventeen to twenty-six age group passed, while only 37.9 percent of the male candidates in the thirty-seven to forty-six age group passed.

[19] Plaintiffs cite *Black v City of Akron, Ohio*, 831 F2d 131 (CA 6, 1987), for the proposition that a statistical disparity revealing a passing rate for a protected group that falls below eighty percent of another similarly situated group is disparate impact per se. Because the passing rate for the older male candidates is only sixty-one percent of the passing rate for the younger male candidates, plaintiffs maintain that this constitutes disparate impact per se and the burden thus shifts to defendant to establish that the physical performance skills test is "valid and job related."

age as opposed to the candidates' failure to attain a general level of overall physical fitness.

However, assuming arguendo, that the "older male candidates" could establish protected class status for purposes of the CRA, plaintiffs' claim alleging age discrimination still fails. To set forth a viable age discrimination claim, it is incumbent on plaintiffs to establish that they had "comparable qualifications" to the individuals ultimately selected. See *Dubey, supra* at 564. The performance skills test is a test that all candidates must pass to gain entry into the police academy well before any decisions are made relative to actual employment.

The purpose of the test is to identify and select those individuals who have attained the highest level of general physical fitness and then permit those individuals to attend the police academy to eventually become certified as police officers. The plaintiffs herein did not pass the initial performance skills test necessary to attend the academy. This indicates that plaintiffs have not achieved an acceptable level of general physical fitness required to attend the academy in the first instance and eventually become eligible for certification as police officers and ultimately employed in that capacity. In other words, plaintiffs were not included in that group of individuals who will become eligible for certification not because age was a "determining factor" thereof, but, rather, because plaintiffs failed to attain an acceptable level of general physical fitness. Accordingly, the "determining factor" was not necessarily the age of the plaintiffs, but rather, plaintiffs' lack of overall general physical fitness.

Conceivably, a claim of age discrimination may obtain where the "older candidates" pass the general

physical fitness portion of the test, attend the academy, become eligible for certification as police officers, and then are subsequently denied employment with an agency in favor of a younger male candidate who perhaps did not perform as well. The employer may thus fall prey to a potential claim alleging age-based discrimination. However, these suppositions are not the facts presented on the record here before us and, thus, constitute nothing more than pure speculation.

On the facts presented for our consideration in the case at bar, a review of the complete record reveals that plaintiffs cannot establish an essential element necessary to sustain a viable claim of age discrimination, specifically that plaintiffs had "qualifications comparable to the person ultimately selected," and that the "determining factor" in the decision not to hire plaintiffs turned on the age of the plaintiffs. *Id.* Because plaintiffs cannot establish "comparable qualifications," and the requisite "determining factor" aspects of their age discrimination case, plaintiffs are not entitled to the injunctive and declaratory relief sought.

### VII. CONCLUSION

On the basis of the foregoing, considering all the documentary evidence in a light most favorable to plaintiffs, and allowing plaintiffs the benefit of all reasonable inferences, we find that there is no genuine issue of material fact upon which reasonable minds could differ, and thus hold that the trial court properly summarily dismissed both of plaintiffs' claims pursuant to MCR 2.116(C)(10).

Affirmed.