**DETROIT POLICE OFFICERS ASSOCIATION; William Morgan; Brian Brunett; Donald Prince, Individually and as Representatives of a Class, Plaintiffs–Appellants,**

v.

**Coleman A. YOUNG, Mayor, City of Detroit; Philip G. Tannian, Chief, Detroit Police Department; Douglas Fraser; Susan Cooper; Charles Butler; Edward Littlejohn; Alexander Ritchie, Members of the Board of Police Commissioners; the City of Detroit, a municipal corporation, Defendants–Appellees.**

No. 91–1806.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 12, 1992.

Decided March 24, 1993.

Allan D. Sobel (briefed), Casimir J. Swastek, Rubenstein, Isaacs, Lax & Bordman, Southfield, and Thomas P. Brady (argued and briefed), Detroit, MI, for plaintiffs-appellants.

Dennis Burnett, City of Detroit Law Dept., Detroit, MI, Daniel B. Edelman (argued and briefed), Yablonski, Both & Edelman, Washington, DC, Barry Goldstein, Saperstein & Seligman, Oakland, CA and James R. Andary, Mt. Clemens, MI, for defendants-appellees.

Before: MERRITT, Chief Judge; NORRIS, Circuit Judge; and WELLFORD, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

For a third time since 1968 when "the Detroit Police Department began to take concrete measures to remedy the effects of past discrimination in its police force," we are confronted with an appeal challenging, this time, the continued effectuation of an affirmative action plan which gives "preference ... to black patrolmen in the initial promotion to sergeant." *Detroit Police Officers Assoc. v. Young*, 824 F.2d 512, 514 (6th Cir.1987). The plan, itself involving promotions, has been before this court in various contexts four times. *Id.* at n. 1. The plan was adopted by the defendant, City of Detroit, with respect to promotion to sergeant almost nineteen years ago.

Plaintiffs are white police patrolmen who contend that they have been discriminated against by reason of their race. They allege that they have been "passed over" (some a number of times) for promotion to sergeant despite attaining higher scores on administered tests than black patrolmen who have been promoted on the basis of "a 50/50 ratio of white to black male officers promoted." *Id.* at 514. At oral argument, we were advised by defendants' counsel that the present ratio of black sergeants is

virtually fifty percent.[1] Data in the record reflects that at that approximate juncture there were four blacks and three whites in top positions of "executives;" ten blacks and two whites in the next positions as "commanders;" and thirty blacks and fifteen whites in positions as "inspectors." There were also majorities of blacks in positions of lieutenant and investigator, and only 42% of the entire department was white. In truth, plaintiffs represent the minority in defendant police department, and a majority of applicants for positions in the department have been black for some eighteen years.[2]

Judge Keith rendered a lengthy opinion in a related case and concluded:

> The City undoubtedly acted in good faith at all times and tried to improve both its hiring and its promotional tests. Preliminary validation studies were done by Andres Inn and John Furcon and on the promotional examination which indicated that the Department was on the right track.

*Baker v. City of Detroit*, 483 F.Supp. 930, 974 n. 79 (E.D.Mich.1979); *aff'd sub nom.*, 704 F.2d 878 (6th Cir.), *modified*, 712 F.2d 222 (6th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). Judge Keith concluded in *Baker* also that service ratings or credits in the testing procedure favored, in the early 1970's, white patrolmen who had, in general, more seniority than black patrolmen.

■ This plan has been beneficial to black patrolmen seeking promotion to sergeant but at some disadvantage to plaintiffs. We have previously approved the implementation of the plan some five years ago because the Detroit Police Department then had moved steadily towards its various goals to place blacks in positions of supervision and command. That goal has been accomplished as the data herein referred to clearly demonstrates.

When the affirmative action plan in question was adopted by the Detroit City Council, the police force was approximately two-thirds white, and the "arbitrary" 50/50 promotion ratio was chosen with the view that attrition and normal procedures would meet the 50% goal for black sergeants in approximately ten years. The chairman of the Council stated "he would see us taking about the next ten years to achieve a *racially* balanced department." J.A. 301 (emphasis added). An economist, then advising the department, felt it to be "entirely possible we will achieve end-goal objectives sooner." J.A. 304.

■ Racial classifications and plans, even if approved as a part of a consent decree, "are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be 'necessary ... to the accomplishment' of their legitimate purpose." *Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (citations omitted). The decree incorporating goals or quotas involving racial classification or "race-conscious relief" as in this challenge, is subjected to "strict scrutiny." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986). The type of relief afforded black applicants who have been promoted to sergeant ahead of plaintiffs must be "warranted by a strong state interest" and be "narrowly tailored." *Mackin v. City of Boston*, 969 F.2d 1273 (1st Cir. 1992). To determine whether a plan is

---

1. The figures reflected that almost exactly one-half of the sergeants were white, as compared to blacks and oriental sergeants:

| | |
|---|---|
| Black sergeants | 309 |
| White sergeants | 312 |
| Hispanic sergeants | 4 |
| Oriental sergeants | 2 |
| TOTAL | 627 |

2. The proportion of blacks in the Detroit "labor pool" (not the *qualified* labor pool), was no more than 43% in 1973. *Baker v. City of Detroit*, 483 F.Supp. at 960. Judge Keith, the author of the *Baker* decision, noted that "starting in 1971, the Department did begin to aggressively recruit minorities." *Id.* at 950. Judge Keith also noted in *Baker* that "1973 and 1974 promotional examinations were not themselves discriminatory," and that there was a significant disparity favoring blacks in 1976 testing in certain aspects. *Id.* at 965.

narrowly tailored, the court should examine the following factors:

the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

*United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987).

■] Limiting the duration of a race-conscious remedy which clearly impacts adversely upon the plaintiffs is a keystone of a narrowly tailored plan as may be seen by recent Supreme Court decisions. We must make "a most searching examination" of such plans. *Wygant*, 476 U.S. at 273, 274, 106 S.Ct. at 1846, 1847. *See Fullilove v. Klutznick*, 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980) (Burger, C.J.).

No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory legal remedies that work against innocent people, societal discrimination is insufficient and over-expensive.

.    .    .    .    .

[P]ublic employers ... must act in accordance with a "core purpose of the Fourteenth Amendment" which is to "do away with all governmentally imposed discriminations based on race." *Palmore v. Sidoti*, 466 U.S. at 432, 104 S.Ct. at 1881–82.

*Wygant*, 476 U.S. at 276, 277, 106 S.Ct. at 1848, 1849.

The Supreme Court has pointed out, moreover, after most of the district court decisions in this longstanding controversy had been reached: "[W]hen a state implements a race-based plan that requires such a sharing of the burden [by innocent parties], it cannot justify the discriminatory effect on some individuals because other individuals had approved the plan." *Id.* at 281 n. 8, 106 S.Ct. at 1851 n. 8.

Under the circumstances of this case, we rule that the goal sought of 50% black (and minority) sergeants has been virtually attained. More than that, however, we are persuaded that the nineteen year term of this plan has been excessive and has worked substantial hardship upon plaintiffs, and will continue to work severe hardship if continued any longer. We have afforded the parties an opportunity to resolve finally this controversy by negotiation for about six months.

The plan, as well as the decree incorporating it, is no longer narrowly tailored. It no longer serves the same compelling state interests as it once did under the changed circumstances of almost two decades.

We, therefore, REVERSE the decision of the district court and declare the City of Detroit plan for promotion to sergeant based on a 50/50 black-white ratio to be at an end. We REMAND the case to the district court for a determination of relief, if any, to which plaintiffs, or their counsel, may be entitled.

MERRITT, Chief Judge.

I concur in the result reached in Judge Wellford's opinion for the Court and in its basic reasoning, although not in all of its language. The affirmative action plan in question providing for an approximately 50–50 ratio of black to white sergeants in the Detroit Police Department has been met. The difference of three sergeants (309 black sergeants and 312 white sergeants) is so narrow as to be of no legal significance. Moreover, as the Court says, this plan has been in effect for almost 20 years. In light of the length of time the plan has been in effect and in light of the fact that the plan's goal has been accomplished, the affirmative action should be terminated. There should no longer remain race conscious selection of sergeants in the Detroit Police Department. Thus I concur with the result in the basic reasoning of the Court's opinion.