**JEFFERSON COUNTY, Kentucky and Charles W. Loeser, Jr., Appellants,**

v.

**Leroy ZARING and Tracy Hord, Appellees.**

No. 2000–SC–0596–DG.

Supreme Court of Kentucky.

Dec. 19, 2002.

584

David Leightty, Louisville, Counsel for Appellants.

Mark L. Miller, Priddy, Isenberg, Miller & Meade PLLC, Louisville, Counsel for Appellees.

David A. Friedman, Louisville, Counsel for Amicus Curiae American Civil Liberties Union of Kentucky.

COOPER, Justice.

This is a civil action for damages brought pursuant to KRS 344.450 of the Kentucky Civil Rights Act (KCRA) alleging reverse racial discrimination in employment. KRS 344.040. A Jefferson Circuit Court jury awarded damages to Jefferson County Police Department (JCPD) Sergeants Leroy Zaring and Tracy Hord because, in November 1994, former JCPD Chief Leon Jones recommended that JCPD Sergeants Thomas Dreher and James Smith be promoted to lieutenant but did not make similar recommendations with respect to Zaring and Hord, and because the Jefferson County Judge/Executive and the Jefferson Fiscal Court followed Jones's recommendations. Zaring, Hord and Jones all are Caucasian males; Dreher and Smith are African-American males.

Jefferson Circuit Court Judge Ellen Ewing set aside the award of damages and entered a judgment NOV in favor of the Fiscal Court. The Court of Appeals reversed and ordered the verdict reinstated. We now reverse the Court of Appeals and reinstate the judgment NOV.

## I. INTRODUCTION.

In *Detroit Police Officers' Association v. Young*, 608 F.2d 671 (6th Cir.1979),[1] Judge Pierce Lively, writing for the Sixth Circuit Court of Appeals, chronicled the history and rationale of affirmative action as an operational requirement of local police departments.

The defense of operational requirements is claimed by the defendants to be an independent justification for the affirmative action plan. The basis of the claim is that improved law enforcement is a sufficiently important reason in itself for affirmative action.

. . .

The argument ... is based on law enforcement experience and a number of studies conducted at the highest levels. *E.g.*, National Advisory Commission on Criminal Justice Standards and Goals, *Police* (1973); National Commission on the Causes and Prevention of Violence, Final Report: *To Establish Justice, To Insure Domestic Tranquility* (1969); Report of the National Advisory Commission on Civil Disorders (1968); President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Police* (1967). As these reports emphasize, the relationship between government and citizens is seldom more visible, personal and important than in police-citizen contact. See *To Establish Justice, supra* at 145; *Report on Civil Disorders, supra* at 300 (New York Times Edition). It is critical to effective law enforcement that police receive public cooperation and support. *Report on Civil Disorders, supra* at 301; *Task Force Report: The Police, supra* at 144–45, 167; *Police, supra* at 330.

These national commissions recommended the recruitment of additional numbers of minority police officers as a means of improving community support and law enforcement effectiveness. In fact, the benefits of [African–American] officers were recognized as early as 1931 by the "Wickersham Commission." *Report on the Causes of Crime* 242, Na-

---

1. In *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225 (6th Cir.1993), the affirmative action plan was held no longer valid as of 1993, when the goal of fifty percent black sergeants had been virtually attained. *Id.* at 228.

tional Commission of Law Observance and Enforcement (Vol.I, 1931).

In 1967, a presidential commission stated the proposition offered by the defendants in this case:

In order to gain the general confidence and acceptance of a community, personnel within a police department should be representative of the community as a whole.

*Task Force Report: The Police, supra* at 167.

This need extends to the higher ranks in the police departments, such as the rank of sergeant involved in this case:

If minority groups are to feel that they are not policed entirely by a white police force, they must see that [African–American] or other minority officers participate in policymaking and other crucial decisions.

*Id.* at 172.

The presence of a mostly white police force in minority communities can be a "dangerous irritant" which can trigger, as it did in Detroit in 1967, a violent response. *Report on Civil Disorders, supra* at 315, 120; see also *id.* at 84–108 (chronology of events of 1967 Detroit civil disorders).

. . .

The argument that police need more minority officers is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police. In short, the focus is not on the superior performance of minority officers, but on the public's perception of

law enforcement officials and institutions.

*Id.* at 695–96.

■ The Kentucky Civil Rights Act (KCRA) was enacted in 1966 to implement in Kentucky the Federal Civil Rights Act of 1964. 1966 Ky. Acts, ch. 2 Art. I, § 101; see KRS 344.020(1). Thus, the provisions of the KCRA are virtually identical to those of the Federal act. *Mills v. Gibson Greetings, Inc.,* 872 F.Supp. 366, 371 (E.D.Ky.1994). For that reason, we held in *Harker v. Federal Land Bank of Louisville,* Ky., 679 S.W.2d 226 (1984), that "in this particular area we must consider the way the Federal act has been interpreted." *Id.* at 229. In 1972, those provisions of Title VII of the 1964 Civil Rights Act that proscribe discrimination in employment were made applicable to states and municipalities. Equal Employment Opportunity Act of 1972 (EEOA), Pub.L. No. 92–261, 86 Stat. 103 (March 24, 1972); see 42 U.S.C. § 2000e(b). The rule of construction enunciated in *Harker, supra,* is especially applicable to KRS 344.040(1) since the definition of employment discrimination in that statute is almost identical to the definition of an "unlawful employment practice" in the EEOA. 42 U.S.C. § 2000e–2(a)(1). Conduct that violates KRS 344.040(1) almost certainly contravenes Title VII as well. *Roy v. Russell County Ambulance Serv.,* 809 F.Supp. 517, 519 (W.D.Ky.1992). This fact tangentially implicates the principle enunciated in *Chesapeake & O, Ry., Co. v. Martin,* 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983 (1931), that an interpretation given to a federal statute by the United States Supreme Court is binding on state courts, "any state law, decision or rule to the contrary notwithstanding." *Id.* at 220–21, 51 S.Ct. at 453.

## II. FACTS.

In early 1980, two JCPD police officers commenced a Title VII action in the Unit-

ed States District Court for the Western District of Kentucky charging racially discriminatory hiring and promotion practices by the JCPD. *Baker v. County of Jefferson,* No. C 80–0039–L(A). At that time, members of minority groups comprised only 2.7% of the total force of the JCPD. A consent decree was subsequently entered in *Baker* requiring, *inter alia,* that one minority member be hired or promoted for every two majority members (Caucasian males) hired or promoted until the percentage of minorities on the force and in the ranks of sergeant, lieutenant, and captain reached a percentage roughly equivalent to their representation in the community as a whole. Otherwise, the factors applicable to promotions remained as required by KRS 78.440(7):

> The grading of promotional tests shall be as follows: sixty percent (60%) for written examination; thirty percent (30%) for oral examination; one percent (1%) for each year in seniority in grade, not to exceed ten percent (10%). Seniority points shall be awarded for each year of service after five (5) full years of service. The results of the written and oral examinations shall be added to the seniority points available to each applicant in determining the applicant's final evaluated rating.

Because of the seniority factor, it was impossible for minority members hired after 1980 to achieve final evaluated ratings (FERs) competitive with those achieved by majority members who had been in grade for at least five years prior to 1980. Thus, to comply with the consent decree, two promotion lists were established for each rank, a "white" list containing majority member candidates and a "black" list containing minority member candidates. For each promotion to a particular rank, one candidate was selected for promotion from that rank's black list for every two candidates selected for promotion from that rank's white list. The lists were compiled by the Secretary/Examiner of the Jefferson County Police Merit Board based on the FERs achieved by the candidates per KRS 78.440(7), *supra.* The lists were certified to the Chief of Police pursuant to Regulation 7.2(3) of the Police Merit Board's Rules and Regulations, the so-called "rule of three":

> If the vacancy is to be filled through promotion, the Secretary/Examiner shall certify to the Chief, from the appropriate eligibility list, names of eligibles in rank order beginning with the top name of the list. The number of names of eligibles certified shall be three more than the actual number of vacancies to be filled.

In other words, if there were three vacancies to be filled by promotion, the "white" list would contain the names of the five candidates who had achieved the highest FERs among majority member candidates, listed in the order of their FERs. The "black" list would contain the names of the four candidates who had achieved the highest FERs among minority member candidates, also listed in the order of their FERs. The Chief would then recommend two candidates for promotion from the five names on the white list and one candidate from the four names on the black list. Though there were some exceptions, the Chief customarily recommended those candidates on each list with the highest FERs. The consent decree expired at the end of calendar year 1989, at which time the percentage of minority members on the force had reached eighteen percent (18%).

Upon expiration of the consent decree, the method for recommending candidates for promotion continued to be by the "rule of three," but only one list of candidates was submitted to the Chief. In mid–1990,

Leon Jones was appointed Chief of the JCPD. During the ensuing 3½ years, Jones was called upon to recommend 35 persons for promotion to the ranks of sergeant, lieutenant or captain. The eligibility lists submitted to Jones for those promotions pursuant to the "rule of three" contained the names of one female and 34 white males—and no African–Americans. Thus, during the period after the expiration of the consent decree until the end of 1993, the JCPD's record for promoting minorities to the ranks of sergeant, lieutenant and captain was one female and "0 for 35" African–Americans. Obviously, a continuation of that trend would have ultimately resulted in a misrepresentation of minorities and women in those ranks similar to that which existed prior to the consent decree.

In response to these statistics, the Jefferson Fiscal Court directed the Police Merit Board to undertake an examination of the promotion selection system and devise a method that would give minorities and women equal access to promotions. The Merit Board appointed a committee of Merit Board members and JCPD members that ultimately recommended that Regulation 7.2(3) be amended to eliminate the "rule of three" with respect to the promotion of sworn officers and to replace it with a system known as "banding." The recommendation was adopted, and the amended regulation provides as follows:

> In compiling every competitive promotion list for examinations given after the effective date of this regulation as amended, the eligible candidates shall be ranked in the order of their ratings earned in the examination given for the purpose of establishing the list. The final earned ratings determined pursuant to state law as a result of the examination process shall be divided into rating bands by the Secretary/Examiner for the purpose of compiling the certified promotion list in each grade. Such rating bands shall be established based on psychometric properties of the test score distribution, and certified as such by the Secretary/Examiner. All test scores falling within a given rating band shall be considered tied. The Secretary/Examiner shall first certify all eligible candidates in the top "A Band" for promotional consideration by the Chief within any rank. No other bands shall be certified to the Chief until such time as all candidates in the "A Band" have either been promoted or formally passed over, with a written explanation for such action delivered by the Chief to the Secretary/Examiner. Upon the exhaustion of all candidates in "A Band" and in the event that there are still vacancies available for promotion, the Secretary/Examiner shall then certify those candidates in the second or "B Band" to the Chief for promotional consideration, and shall continue with the procedures set forth herein for each succeeding band until the expiration of the promotional list or in the event that all candidates on the eligibility list have been promoted, whichever comes first.

Thus, the amended regulation continues to follow the requirements of KRS 78.440(7) to establish the candidates' FERs, but the FERs are used only to determine the "band" to which each candidate is assigned. Otherwise, the FERs play no role in the final selection for promotion. The premise of "banding" is that all test results within a certain range are essentially equal. The written test includes an essay, the grading of which is substantially subjective, and the same is true with respect to the oral examination. Thus, the factor that played the most significant role in differentiating among FERs, thereby substantially disadvantaging minority candidates under the "rule of

three," was seniority. The relatively recently hired minority and women candidates simply did not have enough seniority to achieve an FER high enough to make the list. "[O]nce implemented, fair procedures for choosing low-level employees may take years to show results in the higher ranks." *Boston Police Superior Officers Fed'n v. City of Boston,* 147 F.3d 13, 22 (1st Cir.1998). Thus, the purpose of adopting "banding" was to expand the list of eligible candidates and treat those on each list as equals, thereby reducing the significance of seniority and increasing the promotional opportunities of minority and women candidates.

Due to the almost twelve month hiatus in promotions while Regulation 7.2(3) was being studied and amended, nine vacancies occurred in the rank of sergeant, seven in the rank of lieutenant, and two in the rank of captain. These vacancies were scheduled to be filled by promotion, effective November 15, 1994. At that time, the JCPD consisted of approximately 400 police officers with 40 to 45 sergeant positions and 17 to 20 lieutenant positions. A sergeant was required to be in grade for at least one year before being eligible for promotion to lieutenant. A total of twenty-four sergeants applied for the seven lieutenant vacancies. Fourteen of those candidates were listed in A Band. Twelve, including Zaring and Hord, were Caucasians. The only African–American candidates listed in A Band were Dreher and Smith. The A Band list was submitted to Chief Jones with the candidates' names in alphabetical order and with no information as to the candidates' respective FERs.

Jones admitted at trial that he recommended Sergeants Dreher and Smith for promotion to lieutenant because (1) under banding, they were equally as qualified as the other candidates; (2) this was his first opportunity in his four-year tenure to pro-

mote an African–American candidate; and (3) morale is an important factor in a police department, and the promotions of Dreher and Smith would have a positive impact on the morale of those officers who were minority members. (Jones also appointed one African–American patrolman to sergeant and one African–American lieutenant to captain during the November 1994 promotion cycle.)

## III. REVERSE DISCRIMINATION AND AFFIRMATIVE ACTION.

### A. BACKGROUND.

The United States Supreme Court has held on numerous occasions that reverse employment discrimination against members of a majority group is permissible where necessary to address the results of previous or current discrimination in their favor. *E.g., Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 516, 106 S.Ct. 3063, 3072, 92 L.Ed.2d 405 (1986) ("Title VII permits employers and unions voluntarily to make use of reasonable race-conscious affirmative action"). In response to an assertion that race-conscious affirmative action plans are expressly prohibited by the very language of Title VII, the United States Supreme Court observed in *United Steelworkers of America, etc. v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979):

> It would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had "been excluded from the American dream for so long" 110 Cong. Rec. 6552 (1964) (remarks of Sen. Humphrey), constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.

*Id.* at 204, 99 S.Ct. at 2728.

*Weber* upheld the validity of a private, voluntary, race-conscious affirmative ac-

tion plan because (1) it was designed to break down old patterns of discrimination and to open employment opportunities for minorities in occupations that had been traditionally closed for them and (2) it did not unnecessarily trammel the interests of Caucasian employees. Specifically, the Court noted that the plan did not require the discharge of Caucasian employees, did not create an absolute bar to the advancement of Caucasian employees, and was remedially aimed at a manifest racial imbalance. *Id.* at 208, 99 S.Ct. at 2730. *Cf. Boston Police, supra,* 147 F.3d at 23–25 (an ad hoc and admittedly racially motivated promotion of a minority candidate to police lieutenant over a higher-scoring majority candidate did not violate the Equal Protection Clause because the action was in furtherance of a compelling governmental interest, *i.e.,* to remedy the effects of prior discrimination, and (1) the person promoted did not receive a special or unfair benefit by his promotion, since he was qualified for the position; (2) the promotion did not unduly frustrate the legitimate expectations of those not promoted, since (a) there were more candidates for lieutenant than available positions and (b) those not promoted did not have a property right to the promotion; and (3) the promotion did not unduly interfere with any valid governmental policy, since selection on the basis of strict rank order was designed to ensure that candidates were chosen on the basis of their ability to do the job and the person promoted had that ability).

■ An analysis of the effect of an affirmative action plan on a claim of reverse discrimination under the KCRA is governed by the allocation of the burden of proof in a reverse discrimination claim brought under Title VII. *Harker, supra,* 679 S.W.2d at 229.

## B. MCDONNELL DOUGLAS.

■ *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), was a Title VII action brought by an African–American employee who claimed that he had been subjected to employment discrimination because of his race. In that case, the United States Supreme Court established "the proper order and nature of proof in actions under Title VII," *id.* at 793–94, 93 S.Ct. at 1820, and established the following tripartite analysis:

> First, the plaintiff must establish a prima facie case of discrimination. Second, if the plaintiff carries his initial burden, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the challenged workplace decision. Third, if the defendant carries this burden, the plaintiff has an opportunity to prove that the legitimate reasons the defendant offered were merely a pretext for discrimination.

*Notari v. Denver Water Dept.,* 971 F.2d 585, 588 (10th Cir.1992), *citing McDonnell Douglas, supra,* at 802, 93 S.Ct. at 1824. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000), *quoting Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The defendant's "burden is one of *production,* not persuasion." *Id.* at 142, 120 S.Ct. at 2106 (emphasis added).

■ In a typical discrimination case, the plaintiff satisfies the burden to establish a prima facie case "by showing (i) that he belongs to a racial minority; (ii) that he

applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas, supra,* at 802, 93 S.Ct. at 1824.

■ In a reverse discrimination case in which the discrimination is the product of an affirmative action plan, the *McDonnell Douglas* framework must be appropriately adjusted.[2] First, because the plaintiffs are "white male[s], [they] clearly do[ ] not satisfy prong one" of the prima facie test. *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 454 (7th Cir.1999). "[I]f strictly applied, the prima facie test would eliminate all reverse discrimination suits." *Id.* at 454. *See also Iadimarco v. Runyon,* 190 F.3d 151, 158 (3d Cir.1999) ("Obviously, a White plaintiff can not establish 'membership in a minority group' in the same way a Black plaintiff can."); *Notari v. Denver Water Dept., supra,* at 589 (10th Cir.1992) ("it is appropriate to adjust the prima facie case to reflect the reverse discrimination context of a lawsuit because the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group.") (quotation omitted); *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985) ("a prima facie case of 'reverse discrimination' is established upon a showing that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.")

(quotation omitted); *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981) ("Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated ... it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society.").

■ Second, reverse discrimination cases that are the product of affirmative action plans are, as here, "direct" discrimination cases. Chief Jones admitted that he promoted Dreher and Smith over the other equally qualified candidates because they were African–Americans. Appellants do not deny, indeed they admit, that the promotions of Dreher and Smith were racially motivated pursuant to the affirmative action plan mandated by the Fiscal Court, adopted by the Merit Board, and implemented by Chief Jones. Thus, to prove reverse discrimination, there is no need for plaintiffs like Zaring and Hord who challenge an employment decision flowing from an affirmative action plan to resort to indirect evidence to prove discrimination. Because intentional discrimination is a given, plaintiffs like Zaring and Hord meet their prima facie burden simply by proving that " 'but for plaintiff's race he would have been promoted.'' *Notari, supra,* at 590, *quoting Holmes v. Bevilacqua,* 794 F.2d 142, 146 (4th Cir.1986) (en banc). *See also Taken v. Oklahoma Corp. Comm'n,* 125 F.3d 1366, 1369 (10th Cir. 1997) (holding that "plaintiffs failed to present a prima facie case of race discrimination" because "the evidence does not support an inference that but for plaintiffs'

---

**2.** Generally, the *McDonnell Douglas* framework is inapplicable in a case where there is direct evidence of discrimination. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523

(1985). That is not true, however, when the direct evidence of discrimination is a remedial affirmative action plan. *Johnson v. Transportation Agency, Santa Clara County, infra.*

status as whites, one of them would have been promoted.") (quotation omitted); *Smith v. Secretary of Navy,* 659 F.2d 1113, 1119 (D.C.Cir.1981) ("To state a prima facie case under *McDonnell Douglas,* a plaintiff must make a showing that he would have got[ten] a job or promotion 'but for' an illegal act of discrimination."); *cf. Aiken v. Hackett,* 281 F.3d 516, 519–20 (6th Cir.2002) (holding that Caucasian police officers challenging an affirmative action program lacked Article III standing because they had "neither alleged nor shown that the City would have promoted them if the City had used a race-neutral system in its promotions of police officers.").

■ Third, in a reverse discrimination case, the defendant may meet its burden of production by showing that the alleged discrimination was pursuant to a valid affirmative action plan. As noted in *McDonnell Douglas, supra,* the burden of production may be satisfied by the articulation of a legitimate, nondiscriminatory rationale for the employment decision. "The existence of an affirmative action plan provides such a rationale." *Johnson v. Transportation Agency, Santa Clara County,* 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). Because the defendant's burden is only one of production,

the defendant does not "carry the burden of proving the validity of the plan." *Id.* at 627, 107 S.Ct. at 1449. "The burden of proving its invalidity remains on the plaintiff." *Id.*

■ Finally, once the defendant meets its burden of production with the existence of an affirmative action plan, the burden shifts back to the plaintiffs to prove (1) that the affirmative action plan is invalid or (2) that the defendant's remedial rationale is pretextual. *Id.* at 626, 107 S.Ct. at 1449.[3] Zaring and Hord do not suggest that Chief Jones's remedial rationale was pretextual, *i.e.,* not the true reason for his decision, so the only remaining issue in this final step is whether Zaring and Hord satisfied their burden to prove that the affirmative action plan was invalid.

In accordance with the *McDonnell Douglas* structure outlined *supra,* we ordinarily would begin with a thorough analysis of whether Zaring and Hord met their entire prima facie burden by proving causation in addition to intentional discrimination. *E.g., Taken, supra,* at 1369. Indeed, the trial court entered the judgment NOV in favor of the Fiscal Court because Zaring and Hord did not prove that they would have been promoted but for the application of the affirmative action plan.[4] However,

---

**3.** The *Johnson* Court described the plaintiff's burden as conjunctive, *i.e.,* as having to prove "that the employer's justification is pretextual *and* the plan is invalid," *id.* at 626, 107 S.Ct. at 1449 (emphasis added), but that use of the conjunctive should not be read as holding that the only way a plaintiff could satisfy his burden of proof is by proving the invalidity of the plan. There is no principled reason why a plaintiff should not be able to meet his burden by showing in the traditional manner that "the proffered reason was not the true reason for the employment decision." *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095. It would seem that an employer who points to a valid affirmative action plan despite the fact that the true reason for its decision was a

discriminatory animus towards a given race, religion or gender should not be exempted from liability under Title VII or the KCRA.

**4.** This was the sixth time Zaring had unsuccessfully applied for promotion to lieutenant and the "tenth or twelfth" time for Hord. Zaring testified that he was told he would never be promoted as long as Jones remained Chief (indicating that even Zaring believed Jones's motive for *not* recommending him for promotion was other than racial). Hord blamed "cronyism," as opposed to, *e.g.,* "racism," for the failure of his candidacy. Neither Zaring nor Hord, nor any other witness, testified that either Dreher or Smith was unqualified or even less qualified than Zaring or

in this case we proceed directly to the second and third steps in the analysis because, as discussed *infra*, Zaring and Hord did not even begin to meet their burden of proving that the affirmative action plan was invalid.

## C. VALID AFFIRMATIVE ACTION PLAN.

 It is undisputed that the purpose in amending Regulation 7.2(3) was to substitute "banding" for the "rule of three" in order to end the manifest imbalance in the number of women and racial minorities in the ranks of sergeant, lieutenant and captain and to facilitate the promotion of these historically underrepresented classes. Thus, the amendment was clearly an affirmative action plan. That evidence triggered the third step in the *McDonnell Douglas* analysis and shifted the burden back to Zaring and Hord.

 An affirmative action plan is afforded a presumption of validity and the burden of proof is on the plaintiff to establish its invalidity. *Johnson, supra,* 480 U.S. at 626, 107 S.Ct. at 1449 (1987). Zaring and Hord do not claim that the concept of "banding" is either illegal or unconstitutional, presumably because "banding" has been consistently upheld in the face of every challenge to date. *Chicago Firefighters Local 2 v. City of Chicago,* 249 F.3d 649, 656 (7th Cir.2001), *cert. denied,* 534 U.S. 995, 122 S.Ct. 465, 151 L.Ed.2d 381 (2001); *Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco,* 979 F.2d 721, 728 (9th Cir.1992); *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140 (2d Cir.

1991). Nor do they advance any theory that the amendment of Regulation 7.2(3) was an invalid exercise of affirmative action. As in *Steelworkers v. Weber, supra,* at 208, 99 S.Ct. at 2730, (1) the reason for amending Regulation 7.2(3) to adopt "banding" was to break down the pattern of discrimination evidenced by the four-year record of "0 for 35" and to open employment opportunities for members of minority groups in areas that had been traditionally closed to them; and (2) Regulation 7.2(3) as amended did not trammel the interests of male Caucasian employees such as Zaring and Hord because it was aimed at a manifest racial imbalance and neither required their discharge and replacement by minority employees nor created an absolute bar to their advancement. It simply afforded equally qualified female and minority employees the same opportunity for advancement as Caucasian male employees. Absent any evidence to support a *Weber* finding that the amendment of Regulation 7.2(3) was an invalid affirmative action plan, *Johnson v. Transportation Agency, supra,* required entry of a judgment NOV in favor of the Fiscal Court.

Accordingly, we reverse the Court of Appeals and reinstate the judgment NOV of the Jefferson Circuit Court.

LAMBERT, C.J.; STUMBO, and GRAVES, JJ., concur.

KELLER, J., concurs in result only by separate opinion.

WINTERSHEIMER, J., concurs in result only without separate opinion.

JOHNSTONE, J., dissents by separate opinion.

Hord. There was evidence that unfavorable remarks were made about Zaring's past performance during the command staff meeting at which his candidacy was discussed and evidence that no one at the meeting spoke in favor of Hord's candidacy. Indeed, for all

anyone knows, since the record does not reflect otherwise, Dreher and Smith had the first and third highest FER rankings and, therefore, both Dreher and Smith had higher FERs than Hord and either Dreher or Smith had a higher FER than Zaring.

KELLER, Justice, concurring.

In my opinion, the trial court correctly granted a judgment NOV in favor of Appellants because Appellees failed to prove an element of their prima facie case—i.e., that they would have been promoted to the rank of lieutenant were it not for Chief Jones's intentional discrimination in favor of then-Sergeants Dreher and Smith. Accordingly, I concur in the result reached by the majority. I write separately, however, because, unlike the majority, I believe that Chief Jones engaged in prohibited employment discrimination. As such, I occupy an ideological position far closer to the dissenter than the majority with regard to the primary issues of dispute between them. In my view, Justice Johnstone's dissenting opinion correctly observes that "[t]he discrimination in this case had nothing to do with the banding process itself ... [but] flows directly from Chief Jones's testimony that he promoted Dreher and Smith solely on the basis of their race."[1]

With respect to this "banding issue," I am inclined to believe, as some courts have suggested,[2] that existing affirmative action jurisprudence erroneously tends to homogenize a wide variety of affirmative action techniques by evaluating their permissibility under the same criteria. And, perhaps, traditional equal protection clause and civil rights law "validity" analyses are inappropriate for "inclusive" affirmative action techniques—such as minority recruitment or the banding process utilized by the Jefferson County Police Department—that: (1) can be contrasted from "exclusive" affirmative action techniques seeking to "select some candidates rather than others from a pool"[3] in that the inclusive techniques "have as their primary purpose[s] ensuring that the pool of candidates is as large as possible ... [and] ensur[ing] that as many qualified candidates as possible make it to the selection process";[4] and (2) affect third party members of the majority population only by requiring them to compete with a larger number of qualified candidates. While I see no valid objection to a banding process that merely facilitates equality of opportunity by allowing a greater number of minority applicants to compete for promotions within the Jefferson County Police Department, I cannot extend the same deference to Chief Jones's ad hoc decision to consider race in his promotion decisions once the band of applicants was placed before him:

> The crucial distinction is between expanding the applicant pool and actually selecting from that pool. Expanding the pool is an inclusive act. No one can rightly complain because he has been passed over for a more qualified candidate even if that candidate was recruited .... Exclusion occurs if, for example, the best candidate from the expanded pool fails to get the job because he was passed over for a woman. This can only happen at the selection stage, which occurs after the pool expansion process.[5]

Here, the record establishes unequivocally that Chief Jones engaged in paradigmatic employment discrimination when he evaluated the two minority applicants for lieutenant not upon the basis of their quali-

---

1. *Jefferson Co. v. Zaring,* 91 S.W.3d 595, 599 (2002) (Johnstone, J. dissenting).

2. *See Shuford v. Alabama State Board of Education,* 897 F.Supp. 1535, 1551–1554 (M.D.Ala.1995); *Alspaugh v. Comm. on Law Enforcement Standards,* 246 Mich.App. 547, 634 N.W.2d 161 (2001).

3. *Shuford, supra* note 2 at 1551.

4. *Id.*

5. *Id.* at 1553.

fications but upon the color of their skin. Although I agree with the majority that Regulation 7.2(3) "afforded equally qualified female and minority employees the same opportunity for advancement as Caucasian male employees," [6] I also agree with Justice Johnstone's observation that:

> [T]he record is completely devoid of proof that there existed *any* imbalance in the number of minorities in general, or African–Americans in particular, holding the rank of lieutenant at the time that the promotions in question were made. Such proof was absolutely necessary to defend the decision made by Chief Jones to promote two candidates to the rank of lieutenant solely on the basis of race.[7]

Regulation 7.2(3) had served its function as an inclusive affirmative action technique by the time the band of candidates was submitted to Chief Jones. What happened thereafter constituted employment discrimination. While I agree with the result reached by the majority because I believe that Appellees did not present a prima facie case that would entitle them to the damages the jury awarded them, I emphasize that, in my view, the record contains nothing to warrant, justify, or excuse Chief Jones's intentional discrimination on the basis of race.

JOHNSTONE, Justice, dissenting.

I respectfully dissent because the majority opinion is based on a factual premise that has absolutely no evidentiary support. The majority opinion states that it "is undisputed that the purpose in amending Regulation 7.2(3) was to substitute 'banding' for the 'rule of three' in order *to end the manifest imbalance* in the number of women and racial minorities in the ranks of sergeant, lieutenant and captain and to facilitate the promotion of these historically underrepresented classes." *Slip op.* at 593 (emphasis added). The first part of this statement presupposes the existence of "manifest imbalance" in the number of women and minorities holding the rank of sergeant and above. But the record is completely devoid of proof that there existed *any* imbalance in the number of minorities in general, or African–Americans in particular, holding the rank of lieutenant at the time that the promotions in question were made. Such proof was absolutely necessary to defend the decision made by Chief Jones to promote two candidates to the rank of lieutenant solely on the basis of race.

"Racial discrimination even of the 'affirmative action' sort, when practiced by a public agency and thus subject to the equal protection clause, requires proof, and not merely argument, that the agency had a compelling need to discriminate ...." *Reynolds v. City of Chicago*, 296 F.3d 524, 526 (7th Cir.2002) (citing cases). The only proof in the record that there was compelling need to discriminate on the basis of race in this case is Chief Jones's testimony that, during his first three-and-a-half years as chief, he had not been presented with any African–American candidates for promotion out of thirty-five names presented to him for promotion. This 0 for 35 testimony was apropos of nothing in connection with the existence of manifest racial imbalance within the ranks of the JCPD.

Where a job requires special training, such as a police lieutenant, proof of the existence of manifest imbalance requires a

---

6. *Jefferson Co. v. Zaring, supra* note —— at 595. Justice Johnstone shares this view as well. *Id.* at 599 (Johnstone, J., dissenting) ("The implementation of promotion through banding in this case simply put minorities within the JCPD on a more equal footing with other white officers.").

7. *Id.* at 595 (Johnstone, J., dissenting).

comparison "with those in the labor force who possess the relevant qualifications." *Johnson v. Transportation Agency, Santa Clara County, Calif.*, 480 U.S. 616, 632, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615, 631 (1987). In this case, the proof showed that the JCPD promoted its lieutenants from the ranks of sergeants within the JCPD. Thus, the ranks of sergeants and lieutenants are the labor pools that need to be compared in order to determine whether there was a manifest imbalance in the number of African–American lieutenants. In other words, an imbalance in the number of African–Americans must be established by statistical proof that the number of African–American sergeants is disproportionately greater than the number of African–American lieutenants. *See Boston Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13, 21 (1st Cir. 1998) (concluding that the lingering effects of historical discrimination in the Boston Police Department were established in part by statistical proof of a racial imbalance between the ranks of lieutenants, of which roughly 6 percent were comprised of African–Americans, and sergeants, of which over 17 percent were comprised of African–Americans). There is no proof in this record as to either the number or the percentage of African–American lieutenants and African–American sergeants within the JCPD. There is only the 0 for 35 testimony, which fails even to establish how many candidates for promotion to the rank lieutenant were presented to Chief Jones during the relevant period. For all we know from the record, the promotions at issue in this case represent the first time in Chief Jones's tenure that he had the opportunity to promote a *lieutenant.* Thus, in reality, the applicable ratio might well be 2 for 14—the number of African–American candidates in the 1994 "A Band" relative to the total number of candidates

for lieutenant in the 1994 "A Band"—rather than 0 for 35.

While there may have been in fact a "manifest imbalance" between the number of African–American lieutenants and the number of African–American sergeants in the JCPD when the promotions at issue in this case were made, the record is silent on the question. Thus, the JCPD utterly failed to meet its burden of showing that there was "strong basis in evidence" that remedial action was necessary, *i.e.,* that the race-based promotion was necessary because there was a manifest racial imbalance in the number of lieutenants in its ranks. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500, 109 S.Ct. 706, 724, 102 L.Ed.2d 854, 886 (1989). Therefore, the majority is simply wrong in affirming Chief Jones's decision without any evidence to support a conclusion that it was necessary.

Of course, the majority might well respond by arguing that the equal protection analysis of *Croson* is not applicable here because the obligations of a public employer under the Kentucky Civil Rights Act and the Constitution are not identical. *See Johnson*, 480 U.S. at 632, 107 S.Ct. at 1452, 94 L.Ed.2d at 631. ("[W]e do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans.") While I strongly disagree with the majority's conclusion that the implementation of "banding" constitutes a valid, affirmative action plan in this case, the distinction between Title VII litigation and equal-protection litigation offers no salvation to the majority's holding.

Under *Johnson*, while the defendant-employer does not have the burden of proving that its affirmative action is valid (the burden falls on the plaintiffs to prove that the plan is invalid), the defendant-employer still has the burden of showing

that it was justified in implementing the plan in the first place. *Johnson*, 480 U.S. at 630, 107 S.Ct. at 1451, 94 L.Ed.2d. at 630. To do this, it must be able to show the existence of a "conspicuous imbalance in traditionally segregated job categories." *Id.* Other cases appear to equate "conspicuous imbalance" with a "manifest imbalance." *See, e.g., In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525, 1537 (11th Cir. 1994) (Defendant employer must show that "consideration of the race of promotional candidates was justified by a manifest racial imbalance that reflected under-representation of blacks in traditionally segregated job categories.") But in this case, there is no proof that *any* racial imbalance existed in the ranks of the JCPD when the promotions in question were made. And, thus, there is no proof that the JCPD was justified in implementing an affirmative action plan. Nor was the JCPD justified in making a one time, ad hoc decision to promote solely on the basis of race. *See Boston Police Superior Officers Fed'n*, 147 F.3d at 25 (existing statistical disparity between the number of African–American lieutenants and sergeants coupled with a past history of discrimination provided "a strong basis in evidence" that there was a compelling need to make a one time, ad hoc decision to promote an African–American candidate who would not have been eligible for promotion according to strict rank order). At best, the 0 for 35 testimony is inferential proof of the JCPD's efforts to maintain the racial balance that had already been achieved under the 1980 consent decree.

As noted in the majority opinion, when the JCPD entered into a consent decree with the United States, minorities comprised only 2.7 percent of the total JCPD force. *Slip op.* at 586–87. At the expiration of the decree, the numerical goals of the decree had been reached or exceeded and the percentage of minorities on the force had risen to 18 percent. *Id.* at 587. The decree required not only the hiring of minorities to meet numerical-percentage goals, but also to promote minorities to achieve equivalent numerical-percentage goals in the ranks of sergeant and above. The testimony at trial was that these goals had been met by the time the consent decree expired. Thus, the only conclusion supported by the record in this case is that there was *no* racial imbalance within the JCPD force or between its ranks when the consent decree expired, which is when the 0 for 35 run of no African–American candidates being forwarded for promotion began. Further, the 0 for 35 testimony, in and of itself, offers *no* support for the majority opinion's assertion that banding was introduced to end a manifest racial imbalance in the ranks of sergeant and above within the JCPD, which, presumably, had arisen in the short time after the expiration of the consent decree.

Again, as noted in the majority opinion, "[b]ecause of the seniority factor, it was impossible for minority members hired after 1980 to achieve final evaluated ratings (FERs) competitive with those achieved by majority members who had been in grade for at least five years prior to 1980." *Slip op.* at 587. Thus, when the 0 for 35 run began, most, if not all, of the African–Americans holding the rank of sergeant and above had less seniority than whites holding the rank of sergeant and above. And this would be even more true for the African–American lieutenants, who had first to be promoted to sergeant before rising to the rank lieutenant. Thus, the 35 vacancies that led to the 35 promotions during the 0 for 35 run most likely were the result of the retirement of whites, because whites were more likely than blacks to have their retirement benefits fully

vested during the 0 for 35 period. Therefore, it is at least probable that there was no change in the racial balance of the JCPD during the 0 for 35 run, because during this period white retirees were being replaced by white promotees. This leads back to the conclusion that the race-based promotions were made not to correct any racial imbalance, but rather, only to prevent an imbalance from recurring in the future.

The majority readily embraces this conclusion when it states, "a continuation of that trend [0 for 35] would have ultimately resulted in a misrepresentation of minorities ... in those ranks [sergeant and above] similar to that which existed prior to the consent decree." *Slip op.* at 588. But this is fatal to the majority's conclusion that the banding process constitutes a valid, voluntary affirmative action plan. Maintaining a racial balance is not a proper use of affirmative action. This is made clear in *Johnson*, which, in large part, upheld as valid the affirmative action plan under consideration in that case because the plan's goal was to *"attain* a balanced work force, not to maintain one." *Johnson*, 480 U.S. at 639, 107 S.Ct. at 1455, 94 L.Ed.2d at 635 (emphasis in original). As the *Johnson* Court explained, this "is necessary both to minimize the effect of the program on other employees, and to ensure that the plan's goals [are] not being used simply to achieve and maintain ... balance, but rather as a benchmark against which the employer may measure its progress in eliminating the underrepresentation of minorities and women." *Id.* at 640, 107 S.Ct. at 1456, 94 L.Ed.2d at 636 (internal quotation marks omitted), quoting *Sheet Metal Workers' v. EEOC*, 478 U.S. 421, 477–78, 106 S.Ct. 3019, 3051, 92 L.Ed.2d 344, 389. Thus, the majority's position that banding can be used as a valid, affirmative action tool to *maintain* a racial balance in the JCPD is without support or precedent. Moreover, it misconceives the purpose served by banding in this case.

The change in promotion procedure in the JCPD from the "rule of three" to the banding process appears to be a permanent rather than a temporary measure. Thus under *Johnson*, the JCPD's banding process cannot be maintained as a valid, affirmative action plan because its "goal" of maintaining a balanced work force is not a permissible goal of an affirmative action plan. But this does not mean that banding is an invalid means of promotion. For example, in *Bridgeport Guardians, Inc. v. Bridgeport*, 933 F.2d 1140 (2nd Cir.1991), court-ordered banding was upheld as a valid means of avoiding a disparate impact on minorities that would have resulted from promoting according to "strict rank order." *Id.* at 1149. In *Bridgeport*, banding was ordered by the district court to "enhanc[e] the promotion opportunities of Blacks and Hispanics." *Bridgeport Guardians, Inc. v. Bridgeport*, 735 F.Supp. 1126, 1136 (D.Conn.1990). And so too in this case, banding appears to have lessened or removed any disparate impact on minorities seeking promotion within the JCPD by expanding their opportunities to compete for promotions. Removing a disparate impact to increase the opportunity for promotion is very different than the conscious, race-based decision making of affirmative action. The difference between the two is akin to teaching a hungry man to fish and simply giving a fish to him.

The ultimate goal of affirmative action is to create equal opportunity for all without regard to race or gender. Under affirmative action, the means to reach this goal is the deliberate discrimination on the basis of race, which is deemed necessary in order to place minorities in a position where they can compete freely and equally. But the means should endure no longer than

necessary. The implementation of promotion through banding in this case simply put minorities within the JCPD on a more equal footing with other white officers. Banding created a close enough approximation of equal opportunity to mark the end of any need for further affirmative action. The majority's holding needlessly and erroneously perpetuates race-based decision making and, in the process, sows the seeds of discontent and litigation.

Based on its conclusion that banding is a valid, affirmative action plan, the majority opinion holds that the promotion of minority candidates under the banding process is direct evidence of discrimination. *Slip op.* at 591. Because of this holding, any promotion of a minority under the JCPD's banding process will be subject to legal challenge. Further, the "affirmative action" label taints the achievements of any minority candidate promoted under banding by creating the inference that the promotion was due to the candidate's minority status rather than based solely on the merits of a candidate's qualifications. This is legally wrong, and wrong as a matter of policy.

The discrimination in this case had nothing to do with the banding process itself. Rather, the discrimination flows directly from Chief Jones's testimony that he promoted Dreher and Smith solely on the basis of their race. Because of their race, Dreher and Smith were removed from the roundtable discussion in which Chief Jones met with his staff to discuss the merits of each candidate in order to determine which of the candidates most deserved to be promoted. Dreher's and Smith's qualifications were not discussed because Chief Jones had already made the conscious decision to promote them ahead of everyone else because they were the only African–American candidates in the "A Band." Had Chief Jones treated Dreher and Smith the same as the other candidates in the "A Band" and still promoted them, those promotions should not constitute direct evidence of discrimination as mandated by the majority opinion's holding. Banding should be and can be used to create equal opportunity for promotion for all JCPD officers. If allowed to undertake this positive role, banding should result in a natural, racial balance without any need to resort to the sort of deliberate, race-based decisions sanctioned by the majority's holding in this case. But, alas, this is not to be for the majority prefers its result over logic, reason, and precedent.

I have no doubt that Dreher and Smith have many fine qualities and deserved their promotions. It is a shame that Chief Jones singled them out for promotion solely on the basis of their race. It is a disgrace that the majority chooses to sanction Chief Jones's race-based decision without any evidentiary foundation to support it.

Therefore, I dissent.